Filed 3/30/23  P. v. Williams CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B306974 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. A080152-01 |
| EDWARD CHARLES WILLIAMS, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Mark E. Windham, Judge.  Affirmed.

Marc J. Zilversmit, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Charles S. Lee and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Edward Charles Williams appeals from the superior court's order denying his petition to vacate his murder conviction under Penal Code section 1172.6.[1]  We conclude substantial evidence supports the court's finding, after an evidentiary hearing and beyond a reasonable doubt, that Williams was a major participant in an attempted robbery and he acted with reckless indifference to human life.  We affirm.

## FACTS AND PROCEDURAL BACKGROUND

### 1. *The attempted robbery and murder*[2]

---

[1]  References to statutes are to the Penal Code.  Effective June 30, 2022, former section 1170.95 was renumbered to section 1172.6 with no change in text.  (Stats. 2022, ch. 58, § 10.)

[2]  We take our statement of facts from several sources: (1) The testimony at Williams's April 1990 trial.  These reporter's transcripts are contained in the supplemental clerk's transcript filed December 8, 2020, after Williams's counsel asked the superior court to augment or supplement the clerk's transcript in this appeal.  (2) The record on appeal in Case No. B247801, consisting of 80 volumes of clerk's and reporter's transcripts.  We previously granted Williams's request for judicial notice of this record.  (3) The exhibits submitted by the prosecution in the evidentiary hearing in the superior court, including the preliminary hearing testimony of Carol Croce.  We previously granted Williams's request to augment the record with these exhibits.  (4) The April 29, 2004 minute order as well as findings and conclusions by the Honorable Arjuna T. Saraydarian following a hearing on Williams's petition for writ of habeas corpus in *Williams v. Taylor*, Case No. 001898, Riverside County Superior Court, including a summary of an October 16, 2002 parole board hearing.  We previously granted the Attorney General's unopposed motion to augment the record with this court record.

On the morning of February 16, 1980, Carol Croce was working at a check cashing business on Venice Boulevard in Westwood called C.C.'s Original. C.C.'s was inside Croce's hamburger take-out restaurant. Bruce Horton, who owned C.C.'s, and a teenager named Keith Sarazinski, who helped "clean up the store," were there as well.[3]

Sarazinski had gone outside to wipe off some counters. He stepped back into the restaurant and turned around to lock the glass door. The door slammed open and hit him in the back of the head. The glass on the door shattered and a man later identified as Terry Edwin Prince came in. Prince was wearing a dark jacket or raincoat, dark pants, a knit cap, and gloves. He was holding a "very large black gun"—a .45 caliber semiautomatic handgun—in front of his body with both hands.

Sarazinski got on the floor between the freezer and a counter next to it, and didn't see what happened after that. He did hear someone say, "Get the hell out of there," or "Get out of there." He also heard gunshots.

Both Croce and Horton were in the check cashing booth. Prince came up to the booth, pointed his gun at Croce and Horton, and ordered them out. Prince said, "Get out of there. Give me the fucking money." Ten thousand dollars in cash was stacked in bundles on the counter in the booth.

Croce and Horton came out of the booth and Prince went in. Croce backed toward the door, then started walking back toward the kitchen where Horton was standing. Horton was "involved

---

[3]    Sarazinski later changed his surname to Zarin. (*In re Williams et al.* (Aug. 26, 2014, B247801) [nonpub. opn.] (*Williams III*).)

3

in a struggle" with a second man, later identified as Williams. Williams was wearing a dark raincoat, dark pants, a knit hat, and gloves. Croce had not seen Williams come through the door. He was already in the restaurant when she saw him. Croce never saw Williams with a weapon.

Horton had his hands raised, palms out, and Williams was "[i]nches" from Horton, reaching toward him. Horton told Williams "to be cool to take it easy and not hurt anybody." Williams was reaching inside Horton's jacket. Williams told Horton to "get down." Williams hit Horton "a couple of times"—first, across the temple and then across the shoulders. Williams tried to push Horton to the floor. Williams "hollered" to Prince that Horton "ha[d] a piece."

As Williams "was kind of wrestling" with Horton, Prince shot Horton in the thigh. Croce "pushed at [Prince's] arm and tried to get him to stop," but Prince "flicked his right arm back and pushed [her] behind him." By this time, both Williams and Horton "were almost completely lying down on the floor." Prince took a step forward and fired a second shot at Horton.

Horton, a retired police officer, carried a gun in a shoulder holster. Croce saw Horton's gun in his right hand. Horton had his gun pressed into Williams's side. Horton—lying on his back on the floor, propped up against the refrigerator—fired his weapon and hit a window. Horton apparently fired another shot that struck Williams.[4]

---

[4] We attach in an appendix a diagram of the premises, marked as an exhibit and introduced into evidence in the habeas proceedings described in *Williams III*. This diagram is contained within the records Williams asked us judicially to notice.

4

Prince said, " 'Let's get out of here,' " and he and Williams left.  They didn't take the cash or anything else.  Paramedics arrived, as well as police officers.

Real estate salesman John McCarthy was in his office that morning.  He heard several shots.  McCarthy stood up to look out the window; he saw two men come out of the hamburger stand/check cashing business and run to a brown Mercury parked on Venice Boulevard.  The shorter, "powerfully built" man got into the driver's seat.  The other man, who was taller, "came out walking slowly.  He looked like he'd been hurt.  He was kind of holding his stomach or side."  He got into the passenger side. "They drove off very fast"—"[t]hey really took off."

McCarthy ran out onto the stoop and, as the car drove off, called out the license plate to his co-worker who wrote down, "723 HHZ."  McCarthy gave the numbers to the police.

Around 10:30 or 11:00 a.m. on February 16, 1980, Prince's wife Sheila was at their home.  Prince arrived with Williams and told Sheila that Williams had been hurt; he asked if she'd go with him to the hospital and she agreed.  Sheila had gone to school with Williams's sisters.  The threesome went "immediately" to Daniel Freeman Hospital in Prince's Cadillac. Prince carried Williams into the hospital.  At trial, Sheila claimed not to remember whether she'd spoken with an admittance clerk. Sheila also claimed not to have asked Williams how he got hurt and not to remember "talking about anything" on the way to the hospital.  Nor, Sheila testified, did she remember telling a detective that Prince kept a .45 automatic under the bed.

Rita Tanner Conway was working as a emergency room registration clerk at Daniel Freeman Hospital that February day. Shortly after noon, a man carried another man through the door

"and asked [her] where to put him." Blood was dripping on the floor. A woman was with the two men. She ran up to the window and said, " 'A man's been shot, a man's been shot, we need help.' " Conway ran for help, then asked the injured man his name. She had asked both the man carrying the injured man and the woman who was with him for the man's name but they'd said they didn't know.

Eventually, Williams told Conway his name was Eddie or Ed Tate. The man who'd brought the injured man in said, " 'I don't have time for all this.' " He and the woman got into "a big dark colored car and sped away."

Horton suffered a gunshot wound to the torso, which went into the chest, then lacerated blood vessels around the kidney, causing hemorrhage into the abdominal cavity. A second gunshot wound to the thigh went into the groin area, entered the abdominal cavity, and lacerated arteries. The first wound was a fatal wound; the second one was potentially lethal as well.

Two days before the shooting, Sam Reidelberger was in the Los Angeles area attending a seminar. Reidelberger parked his car—a 1973 Mercury Montega with a license number of 723 HHZ—in a hotel parking garage near La Cienega and Century Boulevard. When Reidelberger returned to where he'd parked, the car was gone. He reported it stolen.

On February 16, Linda Sandoval, who lived near Venice and Westwood, went to the market. When Sandoval returned home, "there was a car in the carport that didn't belong in the building." It was a Mercury with the license plate 723 HHZ. After the car had been there for about three days, Sandoval called the police and "[t]hey came and towed it away."

More than a week after Reidelberger found his car gone from the parking garage, police notified him that they'd found the car. When Reidelberger got the car back, it was banged up, patches had been cut out of the upholstery, and "the cylinder you put the key in was missing." "[T]here was a hole where it used to be."

## 2. *The charges, trial, verdict, and sentence*

The People charged Williams and Prince with Horton's murder. As to Prince, the People alleged the murder was committed while Prince was engaged in the attempted commission of a robbery within the meaning of sections 190.2, subdivision (a)(17)(i) and 190.2, subdivision (b). The People further alleged Prince personally used a firearm in the murder.[5] The People also charged Williams with attempted robbery, and as to both counts alleged he was armed with a firearm within the meaning of then-applicable section 12022, subdivision (a).

Williams and Prince were tried separately.[6] Williams testified in his own defense. Williams said he'd known Prince since junior high school and they were "close associates." On

---

[5] In addition, the People charged Prince with being a felon in possession of a firearm.

[6] Williams's trial did not begin until 1990 because his challenge to the jury selection procedures in Los Angeles County went all the way to the California Supreme Court. (See *Williams v. Superior Court* (1989) 49 Cal.3d 736 (*Williams I*).) At the conclusion of Prince's trial in 1982, the court sentenced him to prison for life without the possibility of parole for the murder, plus two years for the firearm enhancement, and a consecutive term of eight months for the felon-in-possession charge. (*Williams III*.)

7

the morning of February 16, 1980, between 9:00 and 10:00 a.m., Williams was at home when he "heard a horn blow." He looked out the window and it was Prince. Prince was in a green car.

Prince asked Williams "to take a ride to a friend of his in West L.A." Williams agreed. Williams testified he was wearing a blue sweater and beige jeans. He denied having a coat of any kind or a hat. Prince drove to his own apartment. Williams didn't see any guns or other weapons in Prince's car. Nor did he notice the ignition in the car.

Having testified Prince picked him up in a green car, Williams then testified Prince picked him up in his Cadillac Brougham and, after they stopped at Prince's apartment, they got into the green car. They drove to Westwood and Venice, to Prince's friend "Billy's." Prince went upstairs and was gone at least 30 minutes. Prince returned to the car, got in, and drove off.

Prince stopped at "some fast food place" and parked on the street. Prince said he'd be right back and got out of the car. The next thing Williams heard was glass breaking. Williams "was concerned," and got out of the car "[t]o see what was happening with Terry."

Williams walked into the store. He didn't have a gun or any other weapon. Williams testified the "[f]irst thing that happened . . . [was he] was pounced on" or "confronted by" Horton. Williams claimed not to have seen Prince or Croce. He didn't see a gun. Williams and Horton "started to struggle." Williams "began to fight him back."

Williams eventually wound up on top of Horton. Williams didn't know Horton had a weapon until he (Williams) was shot. Williams denied having said, " 'He's got a piece.' " Williams said

8

he didn't recall if he heard anyone say, " 'Let's go, let's get out of here.' " "[A]ll [Williams] remember[ed]" after that was "getting up and getting in the car." Williams testified, "After I was shot I was immediately able to get up and walk away." Williams denied ever having seen Prince with a .45. Williams claimed not to remember anything that happened until he woke up "in a jail ward of county hospital" a couple of days later.

Williams testified he knew "[n]othing at all" about Prince's plans to rob the check cashing stand. He said he had nothing to do with the attempted robbery or the killing of Horton.

On April 19, 1990, the jury convicted Williams of first degree murder and attempted robbery. The jury found true allegations that, in the commission of both offenses, Williams was armed with a firearm—specifically, a handgun.[7] The trial court sentenced Williams to 26 years to life, consisting of 25 years to life for the murder plus one year for the firearm enhancement. On the attempted robbery count, the court sentenced Williams to the midterm of two years, and stayed that sentence.[8] In March 1992, another panel of this court affirmed Williams's conviction. (*People v. Williams* (Mar. 12, 1992, B053231) [nonpub. opn.] (*Williams II*).)

---

[7]     The parties now agree Williams was not armed. The record is unclear as to what happened to the firearm enhancements. In a 2004 proceeding in connection with Williams's habeas petition challenging the denial of parole, a Riverside judge found there was "no credible evidence" that Williams "was actually armed or used a handgun during the commission of the crime."

[8]     The record does not reflect a sentence on the firearm enhancement for the attempted robbery count, nor whether the court struck or stayed it.

9

### 3. *The parole proceedings*

Between February 1998 and September 2007, a series of proceedings took place concerning Williams's suitability for parole.[9]  At his initial parole consideration hearing in February 1998, Williams testified he "kn[e]w [Prince] was going to check th[e] place out . . . [f]or a robbery or whatever."  Williams continued, "I knew he was going to do that. . . .  I did know that.  Okay.  And I never told that before now."  Williams said he didn't know "that was going to happen" until Prince came back downstairs from "Billy's."  Williams denied knowing Prince was armed.

Williams testified that, when he heard glass breaking, he went "to see if [Prince] needed some help or he was having problems or whatever."  Williams continued, "And . . . after I stepped inside the door, a struggle ensued between Mr. Horton and myself."  The commissioner said, "Okay.  So at that point, you participated in the robbery."  Williams replied, "Yes. . . . But I didn't know what was going—you know, well, I guess I did."

At a subsequent hearing in October 2002, Williams essentially repeated this version of events.  He stated, "The only active role I took in this offense was struggling with the victim."

---

[9]     As we noted, we have taken judicial notice of the transcripts of these proceedings, contained within the 80 volumes of appellate record in B247801, at Williams's request.  Courts considering section 1172.6 resentencing petitions properly consider a petitioner's sworn statements made in parole proceedings.  (*People v. Duran* (2022) 84 Cal.App.5th 920, 924, 930-932; *People v. Mitchell* (2022) 81 Cal.App.5th 575, 580-581, 586-587, 590 (*Mitchell*); *People v. Anderson* (2022) 78 Cal.App.5th 81, 84, 93; *People v. Myles* (2021) 69 Cal.App.5th 688, 705-706.)

Williams testified he didn't see Prince shoot Horton. When asked, "[I]f you had been aware that [Prince] was going to take part in a robbery or commit a robbery, would you have taken part in the robbery yourself?" Williams replied, "Yes, I would have."

At another parole hearing in May 2004, Williams testified Prince picked him up that morning "in the stolen car," not the Cadillac. Williams said he thought Prince was just "going to check out this place" "for a criminal act," but wasn't "going to do it right then." Williams added, "And I'm not saying I wasn't a part of the robbery. I'm just saying I didn't know anything about the robbery beforehand." Williams reiterated,

> "I went to the building to help him do whatever he was into. I was going to help him. That's why I'm saying I'm not denying being part of the robbery. I just didn't have any preplanning, no prior knowledge of it being a robbery up until that point. . . . But from that point on, then I'm involved."

At a later parole hearing in January 2005, Williams stated, "I'd like to reiterate my total acceptance for my involvement in this offense and I agree with the Deputy District Attorney there, my actions did play a key role in the death of Mr. Horton . . . ." Williams continued, "Once I made the decision to get out of the car and go in there to help [Prince] with whatever he was doing I became equally liable for whatever went on and I realize that. I'm just saying I had no prior knowledge of it prior to that point and that's all."

Williams was paroled in September 2007.

11

## 4.    *The habeas proceedings*

In September 2007, Williams filed a petition for a writ of habeas corpus.  In June 2009, the trial court stated it would conduct an evidentiary hearing on both Williams's petition and a petition Prince had filed in March 2007.  The hearing apparently took place over several years.  There were two issues:  Williams and Prince contended (1) the prosecution committed a *Brady* violation[10] by failing to give the defense a statement police had taken from an eyewitness, Nelida Walsh; and (2) the introduction of Croce's and Sarazinski's testimony at trial violated "the post-hypnotic exclusionary rule"[11] because Horton's widow, Genevieve, had hypnotized them on the evening of the crime.  (*Williams III*.)

Shortly after the shooting, an officer interviewed Walsh, whose apartment was near the hamburger stand.  Walsh said she'd been going up the stairs of her apartment building when she heard three gunshots.  She turned to see a man in a red shirt or jacket standing at the front doorway of the hamburger stand, holding what looked like a rifle or shotgun.  (*Williams III*.)

As for the hypnosis issue, Croce and Sarazinski met with Genevieve for "no more than 10 to 15 minutes."  Genevieve had taken two classes on self-hypnosis for weight loss.  She "was neither experienced nor well-trained in hypnosis techniques."  Both Croce and Sarazinski testified they were not hypnotized.  Both sides presented expert testimony on hypnosis at the habeas hearing.  (*Williams III*.)

In January 2013, the trial court granted the habeas petitions based on a *Brady* violation:  the failure to disclose

---

[10]    *Brady v. Maryland* (1963) 373 U.S. 83.

[11]    See *People v. Shirley* (1982) 31 Cal.3d 18, 66-67.

12

Walsh's statement. The court, however, rejected defendants' contention that the post-hypnotic exclusionary rule barred Croce's and Sarazinski's testimony. The court found neither Croce nor Sarazinski had in fact been hypnotized. Citing *People v. Alexander* (2010) 49 Cal.4th 846, 882, the court stated, " ' "When a witness actually has not been hypnotized in any meaningful way, despite attempts to do so, the concerns expressed in *Shirley* regarding reliability of the witness's testimony, namely, introduction of false memories and the tendency for the witness to develop unjustified confidence in recollections, are not at issue." . . . Thus, the pertinent question for the Court is not whether Ms. Horton *attempted* to hypnotize Ms. Croce and Mr. [Sarazinski], but whether she actually *did* hypnotize them. The Court finds she did not.' " The court found the prosecution's hypnosis expert "more persuasive," though both experts were "credible." (*Williams III*.)

The People appealed the order granting the habeas petitions and a different panel of this court reversed. As for Walsh's testimony, the appellate court noted Walsh had not said she saw the man at the front doorway fire any shots. In his opening statement at trial, Williams's counsel conceded Prince had entered the restaurant, Williams entered after him, and Prince tried to rob Horton and then killed him. Both Croce and Sarazinski testified they saw someone with a gun actually enter the front doorway after the glass was smashed, and Croce testified that gunman ultimately shot Horton. The evidence that a shooter was in, or at, the front doorway was "comparatively weak," while the evidence Horton was shot by an assailant

13

inside the restaurant was "strong, if not overwhelming."
(*Williams III*.)[12]

**5.** ***Williams's resentencing petition, the order to
show cause, and the evidentiary hearing***

On February 5, 2019, Williams—represented by counsel,
Marc Zilversmit, who also represented Williams in the writ
proceedings arising from parole denials and the appeal in the
habeas case, and represents him in this appeal—filed a petition
on a preprinted form. Williams checked boxes stating the
information had "allowed the prosecution to proceed under a
theory of felony murder," he'd been convicted at trial of "1st or
2nd degree murder [under] the felony murder rule," and he "could
not now be convicted of 1st or 2nd degree murder because of
changes made to Penal Code §§ 188 and 189, effective January 1,
2019." Williams also checked box 5 and all of its subparts,
stating he "could not now be convicted" under those changes
to the Penal Code because he was "not the actual killer," he

---

[12]     In May 2014, Williams filed a "renewed" writ petition
in this court on the hypnosis and Walsh issues. (B256029.)
On May 22, 2014, another panel of this court denied Williams's
motion to consolidate that writ proceeding with the appeal in
B247801. After extensive briefing—including the Attorney
General's submission of a record in excess of 25,500 pages—
the court denied the petition in an order filed July 20, 2015. The
panel made its "own factual determination and express factual
findings that neither Croce nor Sarazinski was hypnotized." The
panel "independently conclude[d] no *Shirley* violation occurred."
We grant the Attorney General's unopposed request to take
judicial notice of the July 2015 order. We deny the Attorney
General's request for judicial notice of the rest of our "records" in
that proceeding as unnecessary to our resolution of this appeal.

"did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder in the first degree," and he "was not a major participant in the felony or [he] did not act with reckless indifference to human life during the course of the crime or felony." Williams also checked the box asking the court to appoint counsel for him.

On February 6, 2019, the trial court appointed Zilversmit as counsel for Williams. On February 22, counsel filed a supplemental memorandum in support of Williams's petition for resentencing. Counsel attached as exhibits what appears to be part of an undated version of the opinion affirming Williams's conviction on direct appeal[13] and the 2014 opinion in *Williams III* reversing Judge Rayvis's order that granted Williams's habeas petition.

After seeking and receiving six extensions of time to respond to the petition, the District Attorney filed a brief on February 3, 2020. The prosecution contended Williams had failed to "make a *prima facie* showing" that he was eligible for relief because he was "a major participant [who acted] with

---

[13] The document attached to counsel's brief ends at the top of page 10 and appears to be a different document than the file-stamped 14-page official opinion issued in Williams's direct appeal. (See *Williams II*.)

15

reckless indifference."[14]   Williams filed a reply brief on May 14,
2020.[15]

_____

[14]     The prosecution added, in a parenthetical, that Williams
"could also be convicted as an aider and abettor to first degree
murder based on his actions."  At the evidentiary hearing,
the prosecutor stated, "[T]here even could be an argument for
an actual aider and abettor as opposed to felony murder."  He
focused his argument, however, on the contention Williams was
a major participant in the attempted robbery who acted with
reckless indifference to human life.  The prosecutor did not
further elaborate on a direct aiding and abetting theory.

[15]     Williams attached as an exhibit to his reply brief an order
filed on December 3, 2004 by the Superior Court for the County of
Riverside in a habeas proceeding concerning the denial of parole.
In the order, the court states Williams filed a writ petition after
the Board of Prison Terms denied him parole in September 2000.
According to the order, the superior court denied the petition
but the court of appeal issued an order to show cause, appointed
counsel for Williams, and issued the writ.  Following further
proceedings before the Board, the superior court, and the court
of appeal, the superior court "substantially grant[ed] the writ"
in an order filed in April 2004.

Williams, however, "objected to some of the findings" "of
law and fact" in the April 2004 order and challenged them "by
means of a Renewed Petition."  The December 2004 order sets
forth the superior court's "findings" on "reconsider[ation]."   One
of the issues the court was to determine was " 'whether there is
some evidence that at the time of the robbery petitioner entered
the store on his codefendant's heels.' "  The court found Williams
"entered the store after his partner, Mr. Prince[,] had entered the
store, and after Mr. Prince had broken the glass.  There is some
evidence to support a finding that [Williams] entered the store
shortly after Mr. Prince."  The court also found there was "some
evidence that [Williams] and his codefendant switched cars"

16

On June 8, 2020, the trial court issued an order to show cause and set the matter for a hearing. On July 20, 2020, Williams filed another brief. On July 24, 2020, the court conducted a hearing. Counsel as well as Williams appeared by telephone.

The prosecutor noted he had submitted "the various court of appeal opinions, the transcripts, and the exhibits." The court replied, "I want you to know that I did take the time over the last while to review all of that material. However, I did not locate testimony by the defendant. I am familiar with the essence of his testimony because it's repeated in a court of appeal decision, but I do not have that transcript. Should I have that before we proceed?"

Williams's counsel said, "I have that, Your Honor, I believe." The court stated, "I do not. Should I read it, or are both sides comfortable with the court of appeal's characterization of Mr. Williams' testimony?" Williams's counsel replied, "I'm comfortable with it. If the court wants to take the matter under submission, I can send it to the court or perhaps, you know, the court is prepared without reading it." Counsel continued, "I do believe that the court of appeal accurately stated his testimony somewhat."

The prosecutor stated the People were going to submit on the transcripts and records he had provided to the court. The court then asked Williams's counsel, "Mr. Zilversmit, do you anticipate presenting any additional evidence?" Counsel replied,

" 'during the robbery.' " The record does not reflect that Williams's counsel ever asked the superior court to take judicial notice of the Riverside court record, either in his briefing or at the evidentiary hearing. (See Evid. Code, §§ 452, subd. (d), 453.)

17

"No. . . . And . . . I have no objection to the court considering all of the evidence [the prosecutor] has asked the court to review, and I would ask the court to review the exhibits [that] I provided in addition." Counsel continued, "I don't anticipate submitting any other exhibits unless the court requests me to provide Mr. Williams' testimony."

The court then heard oral argument. At the conclusion of the hearing, the court denied Williams's petition. The court stated, "Here[,] it seems there is very strong circumstantial evidence that Mr. Williams did in fact plan this armed robbery with Prince." The court discussed the factors listed in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). The court noted that, once Williams called out that Horton "ha[d] a piece," he was "basically inviting [Prince] to shoot [Horton]." The court observed that the jurors "said . . . by their verdict" that Williams knew Prince was armed and he "must have planned a weapon [would be] used."[16] The

---

[16] At oral argument, Williams asserted the court cited the firearm enhancement in its ruling, resulting in its "misguided belief that Williams was armed." Williams stated the People have conceded this error. Williams is mistaken. The district attorney never argued Williams was armed. Rather, the prosecution brief contended Williams "reflected no surprise in seeing his codefendant with a gun," and therefore he "was aware of and knew about it." At the evidentiary hearing, the prosecutor argued the jury had not believed Williams's testimony that "[h]e didn't know what was going to happen." In reply, counsel conceded "[t]he jury did reject Mr. Williams's testimony at the trial, but that was without presentation of any of the evidence of the hypnosis."

In its ruling, the court stated Williams's "argument depends very much upon the court accepting Mr. Williams's

court rejected Williams's contention that he couldn't have "given assistance" to the wounded victim because he himself had been shot. The court concluded, "[T]he People have indeed proved to me beyond a reasonable doubt that the defendant is not eligible because . . . he was not the killer, but he was a major participant in this underlying felony and his actions clearly to this court showed a reckless indifference to life."

Williams's counsel offered to submit Williams's trial testimony. The court replied, "You can send it to me." The court noted, however, "You've agreed that it was fairly characterized by the court of appeal." The court continued, "My sense of it is the story itself is not credible. The jurors clearly rejected it, and I can see why, because it doesn't make any sense to me at all." The court concluded, "You can send it, and maybe there's some nuance in the testimony that adds a dimension that's not present, and what you agree is a fair characterization of his testimony. If you want to submit it that way, that's fine."

On July 28, 2020, Williams filed a "motion to reconsider resentencing." Counsel noted he had "lodged the entire trial transcript." The motion did not focus on Williams's trial

---

testimony." Distinguishing *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*), the court stated, "[H]ere I think that he [Williams] must have known that the killer was armed." The court continued, "When you look at the *Clark* factors, rather than saying did he know that the defendant was armed, I think the jury said obviously by their verdict that they did know he was armed." Read in context, what the court plainly meant was, "[R]ather than saying did [Williams] know that [Prince] was armed, I think the jury said obviously by their verdict that [Williams] did know [Prince] was armed." The court never mentioned the firearm enhancement.

testimony, however, but rather on the unreliability of Croce's testimony and the *Banks/Clark* factors. On July 29, 2020, the court issued an order denying Williams's motion for reconsideration. Having read the trial testimony, the court stated, "Mr. Williams'[s] testimony was accurately characterized by the summary recited by the Court of Appeal. The Court also finds that the testimony of Mr. Williams is not credible and does not support the Motion to Reconsider."

## DISCUSSION

### 1. *Section 1172.6*

"In Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Senate Bill 1437), the Legislature significantly narrowed the scope of the felony-murder rule. It also created a path to relief for defendants who had previously been convicted of murder on a felony-murder theory but who could not have been convicted under the new law. Resentencing is available under the new law if the defendant neither killed nor intended to kill and was not 'a major participant in the underlying felony [who] acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] section 190.2' (Pen. Code, § 189, subd. (e); see *id.*, § 1172.6; Stats. 2018, ch. 1015, §§ 3-4; Stats. 2022, ch. 58, § 10)." (*People v. Strong* (2022) 13 Cal.5th 698, 703.)

Section 1172.6 provides a mechanism by which a person convicted of murder under the former law may be resentenced if he could no longer be convicted of murder because of the changes to section 188. (*People v. Strong, supra,* 13 Cal.5th at p. 708. See generally *People v. Gentile* (2020) 10 Cal.5th 830, 843; *People v. Lewis* (2021) 11 Cal.5th 952, 959-960.) Once a petitioner establishes a prima facie case for relief and the superior court issues an order to show cause, the matter proceeds to an

evidentiary hearing at which it is the prosecution's burden to prove beyond a reasonable doubt that the petitioner is ineligible for resentencing. (*Strong*, at pp. 708-709; *People v. Vargas* (2022) 84 Cal.App.5th 943, 951.) If the superior court finds beyond a reasonable doubt that the petitioner is guilty of murder notwithstanding the amendments to sections 188 and 189, the petitioner is ineligible for relief under section 1172.6. (*Strong*, at pp. 708-709; *Vargas*, at p. 951.)

**2.** ***Our standard of review***

While the superior court acts as an independent factfinder in determining whether the People have met their burden, on appeal the reviewing court applies the substantial evidence standard. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745, 747.) Under this familiar standard, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Vargas*, *supra*, 84 Cal.App.5th at p. 951; *People v. Clements* (2022) 75 Cal.App.5th 276, 298.) "We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (*People v. Edwards* (2013) 57 Cal.4th 658, 715.) In so doing, a reviewing court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Nieber* (2022) 82 Cal.App.5th 458, 476; *People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.) Substantial evidence also includes circumstantial evidence and any

21

reasonable inferences drawn from that evidence. (*People v. Brooks* (2017) 3 Cal.5th 1, 57; *Nieber*, at p. 476.)

We resolve all evidentiary conflicts and questions of credibility in favor of the judgment. (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014, quoting *People v. Cardenas* (2015) 239 Cal.App.4th 220, 226-227.) We cannot reweigh the evidence or reassess witness credibility on our own. (*People v. Young* (2005) 34 Cal.4th 1149, 1181 [resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact].)[17]

---

[17] We reject Williams's contention that our standard of review is de novo. Williams asserts we are reviewing "a cold record" and the superior court's "findings were not based upon [the] credibility of any live witnesses." However, Williams had the opportunity to testify at the evidentiary hearing, and to call any witnesses he wished to call. (§ 1172.6, subd.(d)(3) ["The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens."].) The court asked Williams's counsel, "Mr. Zilversmit, do you anticipate presenting any additional evidence?" Counsel replied, "No," adding that he asked the court to review the exhibits he'd provided and that he had no objection to the court considering "all of the evidence" the prosecution had submitted. If the record is "cold," it's because Williams chose not to testify or to bring any other witnesses before the court.

In any event, Williams's reliance on *People v. Vivar* (2021) 11 Cal.5th 510 is misplaced. *People v. Clements*, *supra*, 75 Cal.App.5th at page 301 rejected the same argument Williams makes, because the inquiry on a section 1172.6 petition is primarily a factual one, especially where the issue—as here— is whether the petitioner acted with reckless indifference to human life. *Clements* found the defendant's reliance on *Vivar* unpersuasive, because the inquiry under section 1437.7—

22

### 3. *Williams was not entitled to a jury trial on his resentencing petition*

Williams contends the trial court erred in denying him relief because the Sixth Amendment guarantees him the right to have a jury determine whether he was a major participant who acted with reckless indifference to human life. Williams acknowledges "some appellate courts ha[ve] rejected this argument." Indeed, Williams cites no case in which an appellate court has held petitioners in section 1172.6 proceedings have a right to a jury.

While the "Sixth Amendment applies '[i]n all criminal prosecutions,' . . . [a] petition under section 117[2.6] is not a criminal prosecution." (*People v. Silva* (2021) 72 Cal.App.5th 505, 520.) Thus, appellate courts consistently have held that the " 'retroactive relief provided by section 117[2.6] reflects an act of lenity by the Legislature "that does not implicate defendants' Sixth Amendment rights." ' " (*Ibid.*; accord, *People v. Schell* (2022) 84 Cal.App.5th 437, 444 ["Courts have unanimously held that section 1172.6 is an act of lenity in which the petitioner has no Sixth Amendment right to a jury trial."]; *People v. Duran, supra,* 84 Cal.App.5th at p. 931 [same]; *People v. James* (2021) 63 Cal.App.5th 604, 610; *People v. Anthony* (2019) 32 Cal.App.5th

---

whether counsel's immigration advice was inadequate and prejudicial—is predominantly one of law. The *Vivar* Court noted nothing in its decision "disturbs a familiar postulate" that review under the substantial evidence standard requires appellate deference to the trial court's factual findings regardless of whether they're based on oral testimony or declarations. (*Vivar,* at p. 528, fn. 7. See also *Mitchell, supra,* 81 Cal.App.5th at pp. 590-591.)

1102, 1156 [relief afforded by Senate Bill 1437 "constituted an act of lenity that does not implicate defendants' Sixth Amendment rights"].)

4. ***Substantial evidence supports the superior court's finding beyond a reasonable doubt that Williams is ineligible for relief under section 1172.6***

In *Banks*, *supra*, 61 Cal.4th 788, and *Clark*, *supra*, 63 Cal.4th 522, and again in *Scoggins*, *supra*, 9 Cal.5th 667, our Supreme Court identified the overlapping factors for assessing whether the defendant was a major participant in an underlying serious felony and acted with reckless indifference to human life for purposes of section 190.2, subdivision (d), and thus for section 189, subdivision (e)(3). These three cases charted a "spectrum of culpability" set forth in two opinions from the United States Supreme Court: *Enmund v. Florida* (1982) 458 U.S. 782, and *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*).

"[I]t is important to consider where the defendant's conduct falls on the 'spectrum of culpability' that *Enmund* and *Tison* established. . . . On one end of the spectrum is Enmund, 'the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state.' " (*Scoggins*, *supra*, 9 Cal.5th at p. 675.) At the other end of the spectrum are the 19- and 20-year-old defendants in the *Tison* case, who were major participants who acted with reckless indifference to human life, even though neither of them shot any murder victim. The California Supreme Court has embraced these federal decisions as "instructive." (*Scoggins*, at p. 675.)

In *Banks* the Supreme Court listed the following factors to consider in determining whether the defendant was a major participant in one of the specified felonies: "What role did the

24

defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803.)

Reckless indifference to human life has a subjective and an objective element.  As to the subjective element, the defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, and he must consciously disregard the significant risk of death his actions create.  As to the objective element, the risk of death must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.  (*Scoggins*, *supra*, 9 Cal.5th at p. 677.)

In *Scoggins* the Supreme Court listed the following factors to consider in determining whether the defendant acted with reckless indifference to human life: "Did the defendant use or know that a gun would be used during the felony?  How many weapons were ultimately used?  Was the defendant physically present at the crime?  Did he or she have the opportunity to restrain the crime or aid the victim?  What was the duration of the interaction between the perpetrators of the felony and the victims?  What was the defendant's knowledge of his or her

25

confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Scoggins*, *supra*, 9 Cal.5th at p. 677; see *Clark*, *supra*, 63 Cal.4th at pp. 618-622.)

The requirements for finding major participation and reckless indifference to human life significantly overlap, for the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life. (*Clark*, *supra*, 63 Cal.4th at p. 615; see *People v. Owens*, *supra*, 78 Cal.App.5th at p. 1023.) No one of these considerations is necessary, nor is any one of them necessarily sufficient. (*Scoggins*, *supra*, 9 Cal.5th at p. 677; see *Banks*, *supra*, 61 Cal.4th at p. 803.) "We analyze the totality of circumstances" (*Scoggins*, at p. 677; see *Mitchell*, *supra*, 81 Cal.App.5th at p. 592) to determine whether Williams acted with reckless indifference to human life.

We apply the *Banks/Clark/Scoggins* factors to the evidence here:

a. *Major participant*

*Role in planning*. On the morning of the attempted robbery, Prince picked up Williams and took him to Prince's house, where the two men left Prince's Cadillac and got into a stolen Mercury with a punched ignition. Both Prince and Williams were similarly attired in dark jackets, dark pants, knit caps, and gloves.[18] While Williams testified at trial that

---

[18] We recognize Williams disputes many of the facts testified to by the witnesses at trial. For example, Williams testified he was wearing "[a] multicolored blue striped velour sweater [and] some beige jeans" that morning. The superior court stated it found Williams's "story" "not credible," adding, "The jurors

26

he had no idea what Prince was up to, in later parole board hearings he freely acknowledged that—at least as of the time they left "Billy's"—he knew Prince was going to case the place for a robbery or burglary. Williams also admitted in a 2002 parole hearing that, had he known Prince was going to commit a robbery, he "more than likely would have" taken part in the robbery himself. As the superior court noted, "there is very strong circumstantial evidence that Mr. Williams did in fact plan this armed robbery with Prince."

*Supplying weapons.* There's no indication Williams gave Prince the gun he used to shoot Horton.

*Awareness of danger posed by nature of the crime, weapons used, or past experience or conduct of other participants.* While Williams described his relationship with Prince as "close associates," there's no evidence Williams had committed any crimes in the past with Prince. When asked at the 2004 parole hearing if he'd known Prince was "involved in criminal activity," Williams answered, "Yes." Williams said he'd known Prince stole cars but had not known him to be involved in robbery: "Car theft, yes. Robbery, I'd never known him to be."

*Defendant's presence at scene of killing, in a position to facilitate or prevent the actual murder; role of defendant's own actions or inaction in the death.* Williams was present at the scene. Williams entered the store on Prince's heels. He then

---

clearly rejected it, and I can see why, because it doesn't make any sense to me at all." "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Jennings* (2010) 50 Cal.4th 616, 638-639.)

"struggled" with Horton, who had his hands up and urged Williams to "take it easy and not hurt anybody." Williams reached into Horton's jacket, then shouted to Prince that Horton "ha[d] a piece." Williams hit Horton in the head and across the shoulders, causing him to fall, then essentially pinned him to the ground as Prince fired the second, fatal shot.

Williams's participation in the attempted robbery as well as the shooting of Horton was key. The record doesn't reflect whether Prince and Williams knew how many people they might find in the store, but Williams's handling of Horton removed the most significant potential resistance to Prince, and guaranteed any struggle would be three-to-two rather than three-to-one. As Williams himself put it in his testimony at his 2005 parole hearing, "[M]y actions did play a key role in the death of Mr. Horton." (See *In re McDowell* (2020) 55 Cal.App.5th 999, 1012 (*McDowell*) [defendant "was present at the scene of the shooting and had an opportunity to restrain [shooter], or otherwise intervene on [victim's] behalf"; even though defendant was knocked to ground after shooter filed warning shot into the floor, court "reject[s] [defendant's] argument that he had no time to say or do something"]; cf. *People v. Richardson* (2022) 79 Cal.App.5th 1085, 1090 [defendant who waited in car while cohort robbed a market and shot the owner, was major participant in robbery; even though no evidence he intended to kill the owner, statement to cohort, "Shoot him," as witness followed cohort, was sufficient].)

*Actions after the use of lethal force.* Williams then fled with Prince. While Williams himself was injured, there's no indication he tried to call for help for Horton, or even to report Horton's

28

injuries to medical personnel once he himself was taken to the hospital.  Williams gave a false name to hospital personnel.

b.        *Reckless indifference to human life*

*Use of gun or knowledge a gun would be used.*  The parties agree Williams was not armed with, nor did he use, a gun.  As for knowledge that Prince had a gun and planned to use it, even if Williams didn't know that before he entered the store, once inside Prince's use of his semiauto must have been obvious, as Prince pointed it at Croce and Horton.  The diagram of the premises shows the check cashing booth was within feet of the door to the outside as well as the refrigerator, where Williams and Horton ended up once Williams forced Horton to the floor.  After Williams yelled to Prince that Horton "ha[d] a piece," Prince shot Horton in the thigh.  Seconds later—with Horton on the floor, now pinned next to the refrigerator—Prince fired the second shot.  According to the testimony and the diagram admitted into evidence, Prince, Williams, Horton, and Croce were within a space no larger than 10 or 12 feet square.

*Number of weapons ultimately used.*  Again, there was evidence only of one gun.

*Physical presence at the scene and opportunity to restrain the crime.*  Again, Williams was present during the attempted robbery and shooting.  He could of course have tried to stop Prince from shooting Horton.  Instead, he seized Horton and searched him, then called out to Prince that Horton had a gun.  As the superior court noted, Williams "basically invit[ed] [Prince] to shoot [Horton]."  In short, Williams's actions heightened—rather than reduced—the risk of violence.

The United States Supreme Court has "stressed the importance of presence to culpability."  Where "the murder is

29

a culmination or a foreseeable result of several intermediate steps . . . , 'the defendant's presence allows him to observe his cohorts so that it is fair to conclude that he shared in their actions and mental state. . . . [Moreover,] the defendant's presence gives him an opportunity to act as a restraining influence on murderous cohorts.' " (*Clark, supra,* 63 Cal.4th at p. 619, citing *Tison, supra,* 481 U.S. at p. 158. See *People v. Nieber, supra,* 82 Cal.App.5th at pp. 478-479 [defendant present at robbery; didn't intervene to prevent murder]; *McDowell, supra,* 55 Cal.App.5th at pp. 1013-1015 [defendant "was present when the violence ensued but took no steps to prevent it"; even accepting defendant's "self-serving statements after the crime that he did not know [shooter] had a gun," he "knew, by no later than the warning shot, that [shooter] was both carrying and willing to fire a gun"].)

*Duration of interaction between perpetrators and victims.* The time from Prince's and Williams's entrances into the store and their subsequent flight was relatively brief. It was enough time, however, for Williams to struggle with Horton, hit him, and then more or less lie on him on the floor while Prince fired a second round into Horton's torso, which went into his chest and killed him. (Cf. *McDowell, supra,* 55 Cal.App.5th at pp. 1005, 1014 [defendant was major participant who acted with reckless indifference even though "events unfolded quickly" after defendant and shooter entered victim's home, and whole incident took maybe a minute].)

*Defendant's knowledge of confederate's propensity for violence or likelihood of using lethal force.* Again, there is no evidence that Williams knew of acts of violence in Prince's past (only a history of theft). Again, however, once Williams entered

the store and saw Prince pointing his gun at Croce and Horton, he must have realized Prince was about to use lethal force.

*Efforts, if any, to minimize risks of violence during the felony*. Williams made no such efforts. Instead, he fought with and restrained Horton, alerting his partner to Horton's possession of a gun. (Cf. *Scoggins*, *supra*, 9 Cal.5th at p. 678 [defendant, who remained at nearby gas station during the course of the crime, "was not in a position to restrain" the shooter]; *Banks*, *supra*, 61 Cal.4th at p. 807 [defendant "did not see the shooting happen, did not have reason to know it was going to happen, and could not do anything to stop" it]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1025-1026 [defendant was "across the street" and "did not see or know if anyone was shot or hurt"].) Williams had the opportunity and ability to intervene. He just chose not to.

The cases Williams cites are distinguishable. In *In re Ramirez* (2019) 32 Cal.App.5th 384, the 19-year-old defendant found two guns in an abandoned house. He and three juveniles decided they "wanted to jack somebody." Later, Ramirez's 16-year-old friend Josh along with another juvenile jogged toward a truck in a parking lot across the street from a bar. Josh had one of the guns. Ramirez heard shots. He gave Josh a ride away from the scene on the handlebars of his bike. Ramirez told police he hadn't seen anything. In vacating the special circumstance, the appellate court noted that, although Ramirez "was in close proximity to the shooting," he was not "close enough to exercise a restraining effect on the crime or his colleagues." (*Id*. at pp. 388-391, 405.) Here, Williams was within feet of Prince when Prince fired two shots at Horton.

31

*People v. Guiffreda* (2023) 87 Cal.App.5th 112 (*Guiffreda*), involved a 19-year-old defendant who agreed with her husband Oie and another man, Peace, to rob a man at the motel where they'd been staying. The plan arose spontaneously when the three saw the victim arrive with a thick bank envelope in his pocket. Guiffreda was to lure the man into a motel room " 'to have sex' "; Oie and Peace then were going to "assault" him and take his money. (*Id*. at pp. 117, 119.)

Unbeknownst to Guiffreda, just before the planned "assault," Oie took a heavy flashlight from a truck in the parking lot. He then beat the victim with the flashlight while Peace hit and kicked him. Guiffreda was in the motel room while this beating took place, but she didn't participate. Guiffreda later told a probation officer that she'd yelled for Oie to stop but he didn't. She pleaded to second degree murder. (*Guiffreda, supra*, 87 Cal.App.5th at pp. 117-120.)

On appeal from the denial of Guiffreda's resentencing petition, the appellate court found the evidence insufficient to establish reckless indifference to human life.[19] (*Guiffreda, supra*, 87 Cal.App.5th at p. 117.) There was no evidence Guiffreda knew the perpetrators would use a weapon of any kind; Oie "likely obtained the flashlight just before entering the room, outside of Guiffreda's presence." Although Guiffreda was present, she could not have "intervened to prevent the beating given that she was outnumbered by her codefendants." (*Id*. at pp. 126-127.)

---

[19] Having reached that conclusion, the *Guiffreda* court did not reach the issue of whether Guiffreda was a major participant in the robbery. (*Guiffreda, supra*, 87 Cal.App.5th at p. 117.)

Here, as we have said, the attempted robbery was not unplanned; at a minimum, Williams later admitted he knew Prince was going to check out the place for a future robbery or burglary. Even if Williams didn't know Prince had a gun until Williams entered the store on Prince's heels, once he saw the gun he chose to struggle with Horton, reach into his jacket, alert Prince that Horton had a gun, hit Horton at least twice, and pin him to the floor while Prince shot him. This is a far cry from Guiffreda's actions of standing by helplessly while her husband and his cohort beat the victim in that case.[20]

If lethal force is not part of the plan, " 'absence from the scene may significantly diminish culpability for death.' " (*McDowell*, *supra*, 55 Cal.App.5th at p. 1012, quoting *Banks*, *supra*, 61 Cal.5th at p. 803, fn. 5.) " 'As a corollary, there may

---

[20] Williams also cites several cases in which the defendant's youth was a major factor in the analysis. (*In re Moore* (2021) 68 Cal.App.5th 434 [16-year-old defendant]; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1090-1091 [although evidence "might well support a conclusion that Jones was a major participant and acted with reckless indifference," court did not consider Jones's youth—"barely 20 years old at the time"; remanded for reconsideration in light of *Moore*]; *People v. Keel* (2022) 84 Cal.App.5th 546, 550, 554, 558-559, 562 [15-year-old Keel and his 18-year-old cohort robbed victim at gunpoint; cohort shot victim; Keel, though present, had no meaningful opportunity to restrain shooter or intervene; encounter with victim was "unexpected and unplanned"].) Williams didn't introduce any evidence he lacked the maturity to comprehend the risks of the crime he committed. (Cf. *People v. Ramirez* (2021) 71 Cal.App.5th 970, 975, 991 [15-year-old defendant "influenced by peer pressure" and "afraid" of consequences if he didn't aid shooter].) Williams was not a teenager; he was a 25-year-old man.

be significantly greater culpability for accomplices who are present.' " (*McDowell,* at p. 1012, quoting *In re Loza* (2017) 10 Cal.App.5th 38, 50; accord, *Tison, supra,* 481 U.S. at p. 158. Cf. *In re Miller* (2017) 14 Cal.App.5th 960, 964 [defendant was not "present at the scene when the shooting occurred"]; *In re Bennett, supra,* 26 Cal.App.5th at pp. 1008-1009 [defendant helped plan robbery of drug dealer and called victim to set up meeting, but was urinating in parking lot when two cohorts crossed the street, went into victim's apartment, and shot him; defendant didn't even know victim had been killed until later].) Considering the totality of the circumstances in the light most favorable to the trial court's ruling, we conclude substantial evidence supports its finding that Williams could be convicted of murder under the new felony-murder standard because he was a major participant in the underlying felony and acted with reckless indifference to human life.

Finally, we decline Williams's invitation to revisit the thoroughly litigated and long-settled issue of whether Horton's widow hypnotized Croce and Sarazinski. As we have said, Judge Rayvis—at the conclusion of lengthy habeas proceedings—found neither Croce nor Sarazinski had "actually [been] hypnotize[d]." (*Williams III.*) In the appellate opinion reversing the grant of the writ, Justice Kitching noted, "Williams does not, in his opening brief, dispute that *neither Croce nor Sarazinski was hypnotized.*" (*Id.*) In the separate 2014-2015 writ proceeding, another panel of this court independently determined neither Croce nor Sarazinski had been hypnotized. (B256029.) We see no reason to second-guess this issue yet again, which now has been considered by multiple bench officers: the trial court and two appellate panels.

## DISPOSITION

We affirm the superior court's order denying Edward Charles Williams's petition for resentencing.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EGERTON, J.

We concur:

EDMON, P. J.

LAVIN, J.

# Appendix



TAKE OUT FOOD
AND
CHECK CASHING

D R 8 0 - 4 5 5 - 6 7 6
SURVEYED JUNE 25, 1985
HOWARD H. HUCKMAN SID LAPD

A = CHECK COUNTER
B = FOOD COUNTER
C = REGISTER
D = COUNTER
E = STACKED CHAIRS
F = TABLE
G = REFRIGERATOR
H = KITCHEN EQUIPMENT
I = DISHWASHER
J = COOLER

10831 VENICE BOULEVARD

0' 1' 2' 3' 4' 5' 6' 7' 8' 9' 10'    15'    20'    25'    30'

BATH ROOM

UTILITY ROOM

STORAGE

KITCHEN

CHECK BOOTH

1592